# Fall-Special Term, 1896,

## CHARLESTON.

FREEPORT STONE CO. *et al. v.* CAREY'S ADM'R *et al.*

Submitted June 6, 1896—Decided Nov. 13, 1896.

1. SALE—PASSAGE OF TITLE—WAIVER.

C., who was a member of the firm of P., C. & Co. becomes the purchaser from H. of the furniture and utensils in the Hotel Windsor, in the city of Wheeling, for the sum of twelve thousand dollars, by an agreement in writing which provides that the same was to be delivered upon the payment thereof; C. paid six thousand and five hundred dollars of the purchase money, and afterwards said property was delivered to C., without requiring the payment of the residue of the purchase money, with the knowledge and consent of H. *Held* that, under the circumstances, H. waived the payment of said residue as a condition precedent to the passage of the title thereto.

2. PARTNERSHIP—PARTNERSHIP ASSETS—DECEASED PARTNER'S INDIVIDUAL DEBTS.

Where a party who is a member of an insolvent partnership is indebted on his individual account to different parties, and dies, the social assets are applicable first to the social debts, and, if insufficient, the social creditors come in as general creditors *pari passu* with separate creditors of the same class upon the separate estate of the deceased partner.

W. H. HEARNE and H. M. RUSSELL for appellants, cited

29 W. Va. 362; 36 W. Va. 361; 33 W. Va. 393; 14 W. Va. 211; 30 W. Va. 586; 41 W. Va. 191; 4 Gratt. 293; 1 Rev. Code 1819, c. 98, s. 3; 26 Gratt. 465; Code 1849, c. 144, s. 13; 86 Va. 478; 13 Va. Law, J. 229; 9 W. Va. 206.

GEORGE W. JEFFERS, A. J. CLARKE, CALDWELL & CALDWELL and ERSKINE & ALLISON, for appellees, cited Code, c. 74, s. 3; 29 W. Va. 362; 30 W. Va. 586; 17 Am. & Eng. Enc. Law, 1202-7; 2 Bates, Part. § 828; 2 Lindley, Part. §§ 598, 599, 601, 603; 8 How. 414; 22 Wall. 395; 2 Md. 15; 116 Ind. 317; 117 Ill. 477; 7 Ohio St. 179, 180; 4 Gratt. 293; 86 Va. 478; 26 Gratt. 455, 465; 86 Va. 478; Code 1819, c. 98, s. 3; 7 Harr. & J. 466; Code 1868, c. 99, s. 13; Const. Art. VI. s. 30; Code Mo. c. 19, §§ 656, 659, 660, 661, 3467; 103 Mo. 79; 46 Miss. 425; 10 W. Va. 175; 121 U. S. 55, 558; 124 U. S. 295; 25 Gratt. 15; 9 W. Va. 206; 3 Kent, Comm. 64, 65; Sto. Part. § 363-382; Code 1849, c. 144, s. 13; 3 Rob. Prac. 106, 108; 2 Bates, Part. § 825; 33 N. J. Eq. 72; Code, c. 99, s. 13; 2 Rev. Rep. 723, 724; 3 Leigh, 553; 7 Leigh, 601; 24 Ala. 628; 24 Mo. App. 445; 142 U. S. 295; 25 Gratt. 1-5; 10 W. Va. 175.

ENGLISH, JUDGE:

On the 21st day of September, 1891, John H. Hobbs, being the owner of the Hotel Windsor, situated in the city of Wheeling, W. Va., and also of the furniture and utensils then in said hotel in said city, entered into a written agreement on that day which is in the following words and figures: "This memorandum of agreement, between John H. Hobbs, of the first part, and D. M. Carey, of the second part, witnesseth: That the party of the first part agrees to sell to the party of the second part all his furniture and utensils in the Hotel Windsor for the sum of twelve thousand dollars, the same to be delivered upon the payment thereof, and the hotel can be had possession of from Todd & Miller, who are now running the same, holding no lease thereon, or, if one is signed by them and the party of the first part, the said lease requires the surrender of the hotel thirty days after the sale of said furniture, and the party of the first part agrees to rent said hotel to D. M. Carey for

the term of ——— years at the rate of ($3,500) thirty five hundred dollars per year, rent payable monthly. [Signed] D. M. Carey. J. H. Hobbs." On the 2nd day of October following said D. M. Carey paid said Hobbs one thousand and five hundred dollars, and on the 6th day of October, 1891, five thousand dollars, on said purchase money for said furniture, leaving a balance of five thousand and five hundred dollars unpaid on the same. On the 9th day of October, 1891, a lease of said hotel property was executed by said Hobbs to E. B. Carney and D. M. Carey. On the 14th day of January, 1892, said D. M. Carey died, and R. H. Cochran was appointed and qualified as his administrator, and on the 28th day of September, 1893, said administrator proceeded to settle his accounts as such before G. R. E. Gilchrist, one of the commissioners for stating accounts, who filed his report with the clerk of the county court of said county of Ohio, in which he ascertained that said D. M. Carey was a member of the firm of Paige, Carey & Co., against which a considerable number of liabilities existed, and that said D. M. Carey was individually indebted to John H. Hobbs in the sum of five thousand and five hundred dollars for the balance due on certain furniture and utensils in the Hotel Windsor, in the city of Wheeling, with interest thereon from the 19th day of October in the year 1891, also to Wheat & Hancher for eighty two dollars and seventy seven cents, and also for the burial and funeral expenses of said Carey, which debts by said commissioner's report were given priority over the partnership debts of said D. M. Carey arising out of the liabilities of the firm of Paige, Carey & Co.; but he also reported that said partnership debts were of equal dignity, and were to be paid ratably if the assets of said estate prove insufficient to pay all of said claims in full. Said partnership creditors, however, were only allowed to share as to any portions remaining unpaid after the firm assets should have been properly applied in payment of firm debts. To this report the said John H. Hobbs excepted, for several reasons, and, among others, because said commissioner therein held that, if the assets of Paige, Carey & Co. were insufficient to pay the creditors of said firm in full, they were entitled to come in and share

equally with the creditors of D. M. Carey, deceased; and the county court sustained the exceptions filed by said John H. Hobbs, and held that the individual estate of the said Carey in the hands of said Cochran, administrator of said Carey, deceased, should be distributed to the individual creditors of the said Carey, and that no part of the same should be paid to the creditors of Paige, Carey & Co. until the individual creditors of said Carey were fully paid, which matter was taken to the circuit court of Ohio county, and on the 16th day of February, 1895, the order and judgment of the county court was affirmed, and the Freeport Stone Company and others applied for and obtained this appeal.

It is claimed that the circuit court erred in ordering the estate of the said D. M. Carey to be distributed in such manner as to give to the said John H. Hobbs and Wheat & Hancher, individual creditors of D. M. Carey, a preference as the creditors of Paige, Carey & Co., and that it was error in said circuit court not to order the individual estate of said D. M. Carey to be distributed ratably among the said individual creditors of the said D. M. Carey, deceased, and the creditors of the firm of Paige, Carey & Co.

The question submitted for our consideration in this case involves the consideration of the right of the creditors of a partnership to resort to the estate of a deceased partner for the payment of their claims, and whether, in so doing, they are entitled to be paid *pro rata* with the individual creditors of such deceased partner out of his individual estate. Upon this question Story on Partnership (section 363) under the head of "Rights of Joint and Separate Creditors in Estate of Deceased Partner," says: "Still another inquiry may remain, in cases where the estate of the deceased partner is not sufficient to pay all his separate debts and all the joint debts, and that is whether the debts are to be paid *pari passu* out of the assets of the deceased, or either is entitled to a preference. The general rule would seem to be, as it is in bankruptcy, that the joint creditors have a priority of right to payment out of joint estate, and the separate creditors a like right of priority to payment out of the separate estate; and the surplus, if any,

is divisible among the other class of creditors." The question we are discussing is considered by Chancellor Kent, in volume 3, § 65, of his Commentaries (13th Ed) and he thus states the law: "The joint creditors have the primary claim upon the joint fund in the distribution of the assets of bankrupt or insolvent partners, and the partnership debts are to be settled before any division of the funds takes place. So far as the partnership property has been acquired by means of partnership debts, those debts have, in equity, a priority of claim to be discharged; and the separate creditors are only entitled, in equity, to seek payment from the surplus of the joint fund after satisfaction of the joint debts. The equity of the rule, on the other hand, equally requires that the joint creditors should only look to the surplus of the separate estates of the partners after the payment of the separate debts. * * * It was a principle of the Roman law, and it has been acknowledged in the equity jurisprudence of Spain, England, and the United States, that partnership debts must be paid out of partnership estate, and private and separate debts out of the private and separate estate of the individual partner. If the partnership creditors can not obtain payment out of the partnership estate, they can not, in equity, resort to the private and separate estate until private and separate creditors are satisfied." These authorities, as we understand it, state the general rule, and, while there are some exceptions laid down, the facts connected with the case under consideration fail to bring it within any of the exceptions stated. In the state of Virginia there seems to have been some diversity of opinion upon this question. In the case of *Sommerville* v. *McCullough*, reported in 8 Leigh, 415, it appears that Edward McCullough was a partner in the mercantile business with one John P. Gillispie at Clarksburg, Va., and that he executed a deed of assignment, not only on his interest in the mercantile concern, but upon lands and personal property belonging to him individually, to secure certain of his individual creditors as well as creditors of the firm. A bill was filed by Maxwell Summerville, one of the creditors of the second class in said deed, claiming that the trustees therein named were irre-

sponsible, and that the assignment was made with fraudulent intent. A decree was rendered by the circuit court, holding said deed fraudulent as to Gillispie and the partnership creditors, and wholly invalid and ineffectual as well to the land and individual effects of Edward McCullough as to said partnership effects. The case was appealed, and the court of appeals, among other things, held: That the deed should be reformed, that the same was valid, and that the social creditors should resort to the social fund, and the private creditors to the private fund. That, as to the social fund, it be distributed thus: (1) Pay the social creditors of the first class to each his full debt, interest, and costs, if sufficient for that purpose, in the order designated by the deed; (2) the residue, if any, to the creditors of the second class *pro rata*. As to the private funds: (1) Pay to Shaw, Tiffany & Co., a private creditor of Edward McCullough, their full debt, interest, and costs; (2) to the creditors of the first class, to each in the order designated by the deed, his full debt, interest, and costs, if sufficient for that purpose, and the surplus, if any, to the creditors of the second class *pro rata*, thus applying the principle that the partnership assets should be used in satisfaction of the partnership debts, and the private property of the individual partners should be applied in extinguishment of the private debts of said partner. In the case of *Morris' Adm'r* v. *Morris' Adm'r*, reported in 4 Gratt. 293, the court was divided in its opinion, and the first point of the syllabus presents the query, "If a joint or partnership creditor is entitled to share in the separate estate of his debtor with the separate creditors of such debtor." When we again turn to the text books, we find that Bates on the Law of Partnership (volume 2, § 825) says: "The cases cited in the note, though in many the statements as to the priority of the separate creditors are *dicta*, show the universality of the recognition that joint estate goes primarily to joint creditors, and separate to separate, in bankruptcy, assignments, or insolvency, and in the distribution of decedents' estates." After the decision rendered by the court of appeals of Virginia in *Morris' Adm'r* v. *Morris' Adm'r, supra*, a statute was enacted, which is found in Code 1849, chapter 144, s.

13, which is also found in Code W. Va. 1891, chapter 99, s. 13, which reads as follows: "The representative of one bound with another, either jointly or as a partner, by judgment, bond, note, or otherwise, for the payment of a debt, or the performance or forbearance of an act, or for any other thing, and dying in the lifetime of the latter, may be charged in the same manner as such representative might have been charged, if those bound jointly or as partners, had been bound severally as well as jointly, otherwise than as partners." And this statute has been construed by the court of appeals of Virginia in the case of *Ashby's Adm'r* v. *Porter*, 26 Gratt. 455. Moncure, P., in delivering the opinion of the court in this case, says: "The only other objection made to the decree of the court below is that 'it was error upon any application of the scale to decree the payment of a debt due from B. Ashby & Sons out of lands belonging to the estate of B. Ashby, deceased, late one of the members of said firm, after the dissolution of the partnership, and until the individual creditors of said B. Ashby, deceased, had been provided for.' This objection seems not to be at all relied on, and little or no notice was taken of it in the argument. At all events, it is wholly unsustainable. The liability of partners for a partnership debt is joint and several, even after the death of one or more of the partners. This has been the case, even at law, ever since the enactment of Code 1849, c. 144, s. 13 [quoting it.] The amendment was made after the decision of the case of *Morris' Adm'r* v. *Morris Adm'r*, 4 Gratt. 293, in which there was much conflict of opinion among the judges. Had the case occured after and been governed by the amended law, it is presumed there would have been no such conflict, for all the judges concurred in holding that, 'two partners having given their joint and several bond to a creditor of the firm for a partnership debt, the creditor is entitled to share with the separate creditors the separate estates of the deceased partner.'" This ruling was followed by the court of appeals of Virginia in the case of *Pettyjohn's Ex'rs* v. *Woodruff's Ex'rs*, 86 Va. 478 (10 S. E. 715) where it was held that "the social assets are applicable first to the social debts, and, if insufficient, the social

creditors come in as general creditors *pari passu* with separate creditors of the same class upon the separate estate of the deceased partner." These cases, as we think, properly construe and interpret the meaning of section 13, chapter 144, Code 1849, which is incorporated in our Code as section 13, chapter 99, Code 1891.

It is, however, contended, by the terms of the contracts between Hobbs and Carey, that the title of the property, consisting of the furniture and utensils in the Hotel Windsor was to remain in Hobbs until paid for by Carey, who agreed to pay twelve thousand dollars therefor, who actually paid one thousand five hundred dollars at one time and five thousand dollars at another time, making six thousand five hundred dollars in all, leaving a balance of five thousand five hundred dollars unpaid, which was to be paid in a few weeks, but Mr. Carey was disappointed in getting the money, and it was not paid. The hotel, however, was rented to Carey & Carney, and they took posession of the furniture at the same time they took possession of the hotel. On page 35 of the record Mr. Hobbs was asked: Question 10: "Did they [meaning Carey & Carney] take possession under the lease which you have identified, and with your knowledge and consent?" and answered, "They did; the lease calls for the hotel." Question 11: "Did they at the same time take possession of the furniture that was in the hotel? and replied, in taking possession of the hotel, they took possession of what was in it." Question 12: "Was this, also, with your knowledge and consent?" Answer: "It was." Question 21: "And let them have the furniture because you had previously made the contract with Carey of September 21, 1891?" to which question he answered, "I did." And thus the said Hobbs, by his own testimony, shows that he delivered the possession of said furniture to said Carey without insisting on the payment of the residue of the purchase money as a condition precedent, which, we consider, constitutes a complete waiver of said condition. It will be perceived that there was no express reservation of title in the contract between said Hobbs and Carey. It merely stated that the property was sold to Carey for the sum of twelve thousand dollars, the same to be delivered

upon the payment thereof. Mr. Hobbs, however, states in his deposition that he delivered it to Carey before the payment of said sum. In doing so he evidently waived this condition. In Benj. Sales (6th Ed.) 282, under the heading "Prepayment of Price," it is said, in a note: "As to the third rule of the text, stated in section 320, that the title will not pass if anything is to be done by the buyer as a condition precedent thereto, the American authorities furnish numerous illustrations. The most frequent is that of payment of price. It being clear that, in the absence of any credit expressly or impliedly allowed, payment is a condition precedent, or, at least, concurrent, it necessarily follows that the right of property does not pass until that is done, even though the article is delivered, unless the circumstances show that the vendor thereby waived his right to immediate payment. * * * And apparently, also, to third parties, claiming under the vendee, except, perhaps, as to them, a waiver of the condition would be more readily inferred from the delivery, if there was no express reservation of the title, than where there was. If the sale was simply a 'cash sale,' no express reservation of title being made, a voluntary delivery without payment might well be considered at least *prima facie* a waiver of prepayment, especially as to third parties," So, in the case of *Upton* v. *Cotton Mills*, 111 Mass. 446, in which it was held that "a delivery apparently unrestricted, of goods sold for cash, is a waiver of the condition that payment is to be made before the passing of the property in the goods, although the seller has an undisclosed intent not to waive the condition." In the case of *Bowen* v. *Burk*, 13 Pa. St. 146, it was held that, "though the terms of a sale be cash, a subsequent delivery without payment passes the property to the vendee, not only as against all the rest of mankind, but against the vendor himself." And again, in the case of *Freeman* v. *Nichols*, 116 Mass. 309, it was held that "an unconditional delivery of goods sold for cash is a waiver of any condition in the contract of sale, and the seller can not maintain an action for the conversion of the goods against a person who has bought them of the original purchaser." So, also, in the case of *Pinkham* v. *Appleton*, 82 Me. 574, (20

Atl. 237) it is held that, "where there is a condition precedent attached to a contract of sale and delivery, the property does not vest in the vendee on delivery until he performs the condition or the seller waives it." An absolute and unconditional delivery is regarded as a waiver of the condition. And in the case of *Smith* v. *Dennie*, 6 Pick. 262, it is held that a voluntary delivery of a chattel sold upon condition, without the delivery's being *sub conditione*, exposes the property to attachment by the creditors of the vendee." And in the case of *Carleton* v. *Sumner*, 4 Pick. 516, the court held that, where goods were purchased on a credit, the vendee agreeing to give therefor certain bills of exchange, and were afterwards put on board a vessel by the vendee's order, without any objection being made by the vendor, the condition of sale had been complied with, and the goods were liable to attachment as the property of the vendee.

In the light of these rulings, we must hold that, the property sold by Hobbs to Carey having been delivered to Carey, with knowledge and consent of Hobbs, without his mentioning or insisting upon the condition mentioned in the agreement, to wit, the payment of the purchase money, said Hobbs must be considered to have waived the condition, and Carey having departed this life, said property must be classed as a part of the assets of said Carey, and as such distributed *pro rata* among his social and individual creditors; and the decrees complained of must be reversed, with costs.